# IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

MARGARET RUBLEE, individually
and as personal representative of
the Estate of VERNON D. RUBLEE,

                Petitioner,

      v.

CARRIER CORPORATION; AIR &
LIQUID SYSTEMS CORPORATION,
as successor by merger to
BUFFALO PUMPS, INC.; CBS
CORPORATION, a Delaware
corporation, f/k/a VIACOM, INC.,
successor by merger to CBS
CORPORATION, a Pennsylvania
corporation, f/k/a WESTINGHOUSE
ELECTRIC CORPORATION;
ELLIOTT COMPANY; GENERAL
ELECTRIC COMPANY; IMO
INDUSTRIES, INC., individually and
as successor in interest to DE LAVAL
TURBINE, INC.; INGERSOLL-RAND
COMPANY; LONE STAR INDUSTRIES,
INC., individually and as successor in
interest to PIONEER SAND & GRAVEL
COMPANY; METROPOLITAN LIFE
INSURANCE COMPANY;
SABERHAGEN HOLDINGS, INC.;
UNION CARBIDE CORPORATION;
and WARREN PUMPS, LLC,
individually and as successor in
interest to QUIMBY PUMP COMPANY,

                Defendants,

PFIZER, INC.,

                Respondent.

No. 75009-7-I

DIVISION ONE

PUBLISHED OPINION

FILED: June 26, 2017

COURT OF APPEALS DIV I
STATE OF WASHINGTON
FILED
2017 JUN 26 AM 8:56

LEACH, J. — Margaret Rublee appeals the summary judgment dismissal of her wrongful death action against Pfizer Inc. She seeks to impose liability on Pfizer as an "apparent manufacturer" under Restatement (Second) of Torts § 400 (Am. Law Inst. 1965), claiming that Pfizer represented itself as a manufacturer of products that caused her husband's mesothelioma. Because Rublee's evidence does not create a genuine issue of material fact about Pfizer's status as an apparent manufacturer, we affirm.

## FACTS

Vernon Rublee died of mesothelioma in 2015. His wife, appellant Margaret Rublee, survives him.

Vernon[1] was a machinist at Puget Sound Naval Shipyard (PSNS) from 1965 to 1980. He worked on steam turbines that were insulated with asbestos "lagging." Other workers periodically replaced this lagging. To do this, they tore off the existing insulation and then "re-lagged" the turbine. To prepare the lagging, they poured bags of insulation cement, or refractories, "in a trough or a bucket and mix[ed] it up."[2] This created dust that would linger at the worksite, exposing those working there to asbestos.

---

[1] We refer to Vernon by his first name to distinguish him from his wife.

[2] Pfizer describes "refractories" as "cement-like powders designed to be mixed with water and applied to the surface of areas exposed to extreme heat."

The workers at PSNS used two refractory products, Insulag and Panelag. Vernon and other PSNS workers testified to seeing "Pfizer" on the product bags.

Quigley Company Inc. actually manufactured Panelag and Insulag. Quigley trademarked Insulag in 1936 and Panelag in 1945. Both contained asbestos until the early 1970s when, faced with growing health concerns, Quigley replaced them with asbestos-free versions.

Pfizer acquired Quigley as a wholly owned subsidiary in 1968. According to Pfizer officers, Quigley continued to operate as a separate corporation, continued to manufacture both products, continued to own the plant where it made them, and continued to buy the raw materials used in them. Pfizer also submitted evidence that Quigley continued to handle sales and distribution of these products by maintaining its own sales employees and receiving and filling customers' orders. Quigley sales employees continued to communicate with purchasers and distributors on Quigley stationery and sign letters on behalf of Quigley. The stationery stated that Quigley was a "Subsidiary of PFIZER, INC." and included a Pfizer logo in the upper-left corner. Quigley invoices included the same information. Purchasers and distributors continued to send orders and letters to "Quigley Company, Inc." And the product distributors advertised themselves as distributors for "Quigley Co." The labels on bags of Insulag and Panelag identified Quigley as the product manufacturer and stated that it was a

subsidiary of Pfizer. Quigley continued to submit forms and distribute safety and promotional materials that identified Insulag and Panelag as Quigley products.

Quigley filed for bankruptcy in 2004.[3] By then, over 160,000 workers had sued the company for injuries caused by asbestos.[4] In 2013, the United States District Court for the Southern District of New York approved a reorganization plan that created an asbestos injury trust to compensate claimants.[5] The court enjoined all parties from suing Quigley for asbestos-related injuries. This "channeling injunction" also prevents asbestos-related injury claims against Pfizer based on its ownership, management, or control of Quigley, including claims based on "piercing the corporate veil" or successor liability theories.[6] But the channeling injunction does not bar claimants from alleging that Pfizer is liable as an apparent manufacturer.[7]

Rublee sued Pfizer and several other companies for damages.[8] The trial court dismissed the claims against Pfizer by summary judgment. This court

---

[3] In re Quigley Co., No. 04-15739(SMB), 2008 WL 2097016, at *1 (Bankr. S.D.N.Y. May 15, 2008), rev'd, 449 B.R. 196 (S.D.N.Y. 2011), aff'd, 676 F.3d 45 (2d Cir. 2012).
[4] Quigley, 2008 WL 2097016, at *1.
[5] See 11 U.S.C. § 524(g) (Bankruptcy Code). Pfizer states that it has funded approximately $965 million of the trust.
[6] Quigley, 676 F.3d at 60 & n.18.
[7] Quigley, 676 F.3d at 60-61 (holding that injunction does not prohibit apparent manufacturer claim because such a claim is not "a legal consequence of" Pfizer's ownership of Quigley).
[8] Rublee converted this suit to a wrongful death action after Vernon died.

granted discretionary review on the issue of Pfizer's alleged apparent manufacturer liability.[9]

At least two plaintiffs have brought apparent manufacturer claims against Pfizer in the United States District Court for the Western District of Washington. In Turner v. Lockheed Shipbuilding Co.[10] and Sprague v. Pfizer, Inc.,[11] that court dismissed the claims at summary judgment. The Ninth Circuit stayed an appeal in Sprague pending this appeal.

## STANDARD OF REVIEW

We review an order granting summary judgment de novo, making the same inquiry as the trial court.[12] We affirm summary judgment when no genuine issue as to any material fact exists and the moving party is entitled to judgment as a matter of law.[13] We view the facts and all reasonable inferences from them in the light most favorable to the nonmoving party.[14] A genuine issue of material fact exists if reasonable minds could differ about the facts controlling the

---

[9] See RAP 2.3(b)(4).

[10] No. C13-1747 TSZ, 2013 WL 7144096 (W.D. Wash. Dec. 13, 2013) (court order).

[11] No. 14-5084 RJB, 2015 WL 144330 (W.D. Wash. Jan. 12, 2015) (court order).

[12] Owen v. Burlington N. Santa Fe R.R. Co., 153 Wn.2d 780, 787, 108 P.3d 1220 (2005).

[13] Owen, 153 Wn.2d at 787.

[14] Lybbert v. Grant County, 141 Wn.2d 29, 34, 1 P.3d 1124 (2000).

outcome of the lawsuit.[15] The nonmoving party "must set forth specific facts showing a genuine issue" and "may not rely on speculation, argumentative assertions that unresolved factual issues remain, or on having its affidavits considered at face value."[16]

## ANALYSIS

Rublee relies on section 400 of Restatement (Second) to establish Pfizer's liability. Section 400 states that "[o]ne who puts out as his own product a chattel manufactured by another is subject to the same liability as though he were its manufacturer." The legal community commonly calls this "apparent manufacturer liability."

Apparent manufacturer liability predates the doctrine of strict liability for harms caused by unreasonably dangerous goods.[17] Some courts have concluded that since both doctrines aim to remedy the same harms, strict product liability has in effect "absorbed" the apparent manufacturer doctrine.[18] Others have expanded the apparent manufacturer doctrine to include actors that

---

[15] Ranger Ins. Co. v. Pierce County, 164 Wn.2d 545, 552, 192 P.3d 886 (2008).

[16] Baldwin v. Sisters of Providence in Wash., Inc., 112 Wn.2d 127, 132, 769 P.2d 298 (1989); Leahy v. Quality Loan Serv. Corp. of Wash., 190 Wn. App. 1, 4-5, 359 P.3d 805 (2015) (citing Wash. Fed. Sav. v. Klein, 177 Wn. App. 22, 311 P.3d 53 (2013)), review denied, 185 Wn.2d 1011 (2016).

[17] Hebel v. Sherman Equip., 92 Ill. 2d 368, 442 N.E.2d 199, 201, 65 Ill. Dec. 888 (1982).

[18] Hebel, 442 N.E. 2d at 202.

would not be strictly liable because they are outside the good's chain of distribution, such as trademark licensors.[19] The Washington legislature incorporated both the apparent manufacturer doctrine and strict product liability in the 1981 Washington product liability act (WPLA), chapter 7.72 RCW.[20] Preexisting law governs claims that, like Rublee's, arose before the effective date of this act, July 26, 1981.[21]

First, we must decide whether § 400 applies to claims that arose before the WPLA took effect. No Washington appellate court has adopted § 400. Our Supreme Court has adopted similar sections of Restatement (Second).[22] This court cited § 400 in a 1975 decision but did not adopt it.[23] And the majority of jurisdictions to consider § 400 have adopted it.[24] From this history, the United

---

[19] Stein v. Pfizer Inc., 228 Md. App. 72, 137 A.3d 279, 290-91 (2016) (citing Carter v. Joseph Bancroft & Sons Co., 360 F. Supp. 1103, 1107 (E.D. Pa. 1973); Connelly v. Uniroyal, Inc., 75 Ill.2d 393, 389 N.E.2d 155, 161, 163, 27 Ill. Dec. 343, (1979); Brandimarti v. Caterpillar Tractor Co., 364 Pa. Super. 26, 527 A.2d 134 (1987)), cert. denied, 146 A.3d 476 (2016).

[20] RCW 7.72.010(2) (defining "manufacturer" to "include[ ] a product seller or entity not otherwise a manufacturer that holds itself out as a manufacturer"); RCW 7.72.030(1).

[21] Koker v. Armstrong Cork, Inc., 60 Wn. App. 466, 472, 804 P.2d 659 (1991); RCW 4.22.920.

[22] Ulmer v. Ford Motor Co., 75 Wn.2d 522, 452 P.2d 729 (1969) (applying § 402A strict product liability to manufacturers); Seattle-First Nat'l Bank v. Tabert, 86 Wn.2d 145, 542 P.2d 774 (1975) (applying § 402A to sellers and suppliers); Grimsby v. Samson, 85 Wn.2d 52, 59, 530 P.2d 291 (1975) (applying § 46 and comments).

[23] Martin v. Schoonover, 13 Wn. App. 48, 54-55, 533 P.2d 438 (1975).

[24] See Long v. U.S. Brass Corp., 333 F. Supp. 2d 999, 1003 (D. Colo. 2004) (collecting cases).

States District Court for the Western District of Washington has twice concluded that the Washington Supreme Court would adopt § 400.[25] We agree. For purposes of this appeal, we assume that the Washington Supreme Court would apply § 400 when presented with the appropriate case.

Because no Washington court has addressed apparent manufacturer liability under § 400, this case presents an issue of first impression. For persuasive authority, we look to other courts' applications of § 400.

Courts generally have applied one of three tests for apparent manufacturer liability: objective reliance, actual reliance, and "enterprise liability."[26] We do not need to decide which of these tests, if any, our Supreme Court would adopt because Rublee has not identified evidence sufficient to satisfy any of them.

The majority of courts to adopt apparent manufacturer liability have applied the objective reliance test.[27] This test asks "whether a reasonable consumer would have relied upon a label or advertising materials of a product in purchasing it."[28] A court can answer this question "from the vantage point of an ordinary, reasonable consumer or from the perspective of a reasonable

_____

[25] Turner, 2013 WL 7144096, at *2.
[26] Stein, 137 A.3d at 294.
[27] Stein, 137 A.3d at 290.
[28] Stein, 137 A.3d at 294-95; see, e.g., Hebel, 442 N.E.2d at 203; Burkhardt v. Armour & Co., 115 Conn. 249, 161 A. 385, 391 (1932).

purchaser, in the position of the actual purchaser."[29] Pfizer contends that we should apply the test from the viewpoint of the agents who actually purchased Insulag and Panelag for steel mills, power plants, and shipyards like PSNS. Rublee asserts that we should instead ask whether an ordinary user of Insulag and Panelag would think Pfizer manufactured them.

We agree with Pfizer. Courts applying the objective reliance test appear to have done so uniformly from the viewpoint of the "purchasing public." In the classic apparent manufacturer case, where a consumer sues the retailer or distributor that sold a harmful good to the consumer, the purchaser would also be an "ordinary user."[30] But in cases where a sophisticated industrial entity purchased the product, courts have applied the test from the viewpoint of a "reasonable purchaser" in that position.[31]

For example, in Hebel v. Sherman Equipment,[32] the Supreme Court of Illinois rejected as irrelevant a car wash employee's argument that a reasonable person in his position would think the defendant manufactured the conveyor belt that injured him. Sherman manufactured most of the other pieces of equipment

---

[29] Stein, 137 A.3d at 295.

[30] See Hebel, 442 N.E.2d at 202; RESTATEMENT (SECOND) OF TORTS § 400 cmt. d, illus. 1-2; see, e.g., Burckhardt, 161 A. at 391 (holding that distributor put out corned beef can as its own where it placed trademark on label and label did not identify actual packer).

[31] Stein, 137 A.3d at 296-97.

[32] 92 Ill. 2d 368, 442 N.E.2d 199, 202-03, 65 Ill. Dec. 888 (1982).

at the car wash, each of which were sold and operated separately from the hazardous conveyor.[33] The court observed that the "primary rationale" of the apparent manufacturer doctrine is that the defendant "has induced the purchasing public to believe that it is the actual manufacturer, and to act on this belief—that is, to purchase the product in reliance on the apparent manufacturer's reputation and skill in making it."[34] The court held that a reasonable purchaser of car wash equipment would not rely on the possible impression a "casual observer" like the plaintiff might have that the defendant manufactured the machine.[35]

The Maryland Court of Special Appeals adopted this reasoning in Stein v. Pfizer, Inc.[36] In applying the objective reliance test to a claim very similar to Rublee's, the court required the plaintiffs to "show that a reasonable purchaser of refractory materials, that is, Bethlehem Steel, . . . would have relied upon Pfizer's reputation and assurances of quality in purchasing . . . Insulag."[37]

Rublee cites no case asking whether an ordinary user who was not a purchaser would rely on a defendant's representation. Instead Rublee relies on cases that either apply the test from a "purchasing public" viewpoint or address

---

[33] Hebel, 442 N.E. 2d at 203.
[34] Hebel, 442 N.E. 2d at 203.
[35] Hebel, 442 N.E. 2d at 203.
[36] 228 Md. App. 72, 137 A.3d 279, 296, cert. denied, 146 A.3d 476 (2016).
[37] Stein, 137 A.3d at 296.

what parties can <u>recover</u> for injuries from defective products.[38]  As discussed above, courts applying an objective test have done so from the perspective of a "reasonable purchaser in the position of the actual purchaser."[39]

Rublee contends that her evidence creates a fact question even under this test.  We disagree.[40]

The record contains several marketing items and pieces of correspondence that include Pfizer's logo.  Advertising fliers show the logo alongside Quigley's, with "Manufacturers of Refractories" printed beneath.[41] Quigley salespeople distributed pocket calendars also bearing Pfizer's logo.  In a Pfizer shareholder report, photographs of Quigley plant construction sites call them "Pfizer construction sites."  Another report refers to "the Quigley Magnesite Division of Pfizer Chemical Corporation."  Invoices for Insulag and Panelag include the Pfizer logo in the corner.  And a letter from Quigley's vice president

---

[38] <u>See, e.g.</u>, <u>Heinrich v. Master Craft Eng'g, Inc.</u>, 131 F. Supp. 3d 1137, 1160 (D. Colo. 2015) ("reasonable member of the buying public").

[39] <u>Stein</u>, 137 A.3d at 295; <u>see</u> <u>Hebel</u>, 442 N.E. 2d at 203; <u>Kennedy v. Guess, Inc.</u>, 806 N.E.2d 776, 784 (Ind. 2004) ("purchasing public").

[40] <u>See</u> <u>Robinson v. City of Seattle</u>, 119 Wn.2d 34, 57, 830 P.2d 318 (1992); CR 56(c).

[41] Both offer pre-1968 Quigley logos that, they assert, support their side. Rublee points to an information sheet from before the acquisition, which reads "Manufacturer of Refractories" under the Quigley logo.  Pfizer counters with materials from before the acquisition that read "Manufactur<u>ers</u> of Refractories" under Quigley's name.  Neither argument is determinative because at the time Pfizer owned Quigley, a reasonable consumer would not necessarily know how Quigley advertised itself in the past.

regarding discontinuing Insulag and Panelag again includes Pfizer's logo in the top-left corner.

This evidence does not create a fact question about objective reliance. Rublee overstates the prominence of the Pfizer logo in the pocket calendar and correspondence. While these materials include Pfizer's logo, both feature Quigley's name more prominently, with "subsidiary of Pfizer" under it.[42] The product invoices feature Quigley's logo and address in the top center. A reasonable reader would not infer from these items that Pfizer manufactured the products.

Likewise, a caption in a shareholder report that refers to a Quigley plant in Ireland as a "Pfizer construction site[ ]" does not, in context, give the impression Rublee attributes to it. While those words appear in small font above the photos, the text of the report makes clear that the plants belonged to Quigley and that Quigley was Pfizer's subsidiary.[43] And a single reference to "the Quigley Magnesite Division of Pfizer Chemical Corporation" in another report does not create a fact question, particularly in light of that passage's opening sentence: "Nineteen-seventy sales of refractory specialties manufactured and marketed by

---

[42] Also, a "technical data" sheet on Insulag includes the Pfizer logo but reads "a subsidiary of Pfizer Inc." under the Quigley name.

[43] The report states, "Construction work continued throughout 1969 on Quigley's dolomite stone processing plant . . . and on the sea-water magnesite plant at Dungarvan . . . .They will provide high-purity, low-cost magnesite grain for use in many of Quigley's specialty refractory formulations."

Quigley Company, Inc., a Pfizer subsidiary . . . . " Thus, while this evidence shows that Pfizer and Quigley had a corporate relationship, no reasonable industrial purchaser could infer from it that Pfizer actually manufactured the refractories.

The record also contains deposition testimony from several workers who said that they noticed the Pfizer name on bags of refractory materials at PSNS. But this testimony has little relevance to a reasonable purchaser's understanding of the products' manufacturer because Rublee has not shown that any of the workers had any role in any purchasing decision. And even if this court applied the objective reliance test from a reasonable user's viewpoint, none of the workers stated that they took any action based on seeing Pfizer's name on the products.[44]

Finally, Rublee contends that her expert's affidavit created an issue as to a reasonable consumer's understanding that Pfizer manufactured the products. Rublee submitted an affidavit from a "branding specialist," Steff Geissbuhler, opining that Pfizer logos on the documents Geissbuhler reviewed would confuse consumers as to who manufactured the product. "In general, an affidavit containing admissible expert opinion on an ultimate issue of fact is sufficient to

---

[44] Rublee contends the trial court ignored the workers' impressions of Pfizer's role and her expert's testimony on consumer perceptions. But how the trial court reached its decision does not affect this court's de novo review. See Duckworth v. City of Bonney Lake, 91 Wn.2d 19, 21-22, 586 P.2d 860 (1978).

create a genuine issue as to that fact, precluding summary judgment."[45] But Geissbuhler's testimony does not preclude summary judgment here because it does not address the relevant issue of fact.

Geissbuhler opined that "Pfizer's logo on various Quigley communications strongly suggested to the average consumer that Pfizer played a supervising role in the manufacture of the product at issue" and that "the invocation of its brand identity could impact consumer perception of Insulag and Panelag and effect [sic] their purchasing decisions." As discussed above, the objective reliance test depends on the perception of a reasonable purchaser in the actual purchaser's position. Whether Geissbuhler's declaration created a fact issue on that point thus depends on what he meant by "average consumer."

Geissbuhler's deposition testimony shows that he meant an ordinary member of the public. Geissbuhler conceded that he did not know who was buying Insulag and Panelag. He did not know, for instance, whether the products were available at the hardware store or bought by sophisticated industrial purchasing departments.[46] His testimony thus does not help Rublee show what

_____

[45] J.N. v. Bellingham Sch. Dist. No. 501, 74 Wn. App. 49, 60-61, 871 P.2d 1106 (1994).

[46] Geissbuhler's deposition transcript reads in part: "Q. Do you have an opinion . . . on whether or not purchasers of, say, Insulag would be more knowledgeable than the average consumer? A. I don't. I mean, I really don't." The testimony from Geissbuhler that Rublee relies on to show "that sophisticated industrial purchasers could reach similar conclusions" to Vernon's coworkers does not support such a conclusion. Geissbuhler did not directly answer the

a reasonable purchaser in the position of PSNS purchasers would have understood.

None of the evidence relevant to the understanding of industrial purchasers suggests they would think Pfizer manufactured the products. For instance, Lone Star Industries and Pioneer Sand & Gravel—distributors that sold the products to PSNS—continued to send purchase orders and questions to Quigley and to advertise Quigley as the products' manufacturer.[47]

Because the record does not create a genuine issue of material fact as to whether a reasonable purchaser of Insulag and Panelag would think Pfizer manufactured them, Rublee's argument fails under the objective reliance test.[48]

Likewise, Rublee's claim would not succeed under any of the alternative tests the parties advance.

---

attorney's questions on whether "the average purchasing agent of a fireproofing insulation company would be confused as to who the manufacturer of the Insulag product is"; he appeared to answer instead from either an ordinary person's viewpoint or his own.

[47] A former Lone Star employee confirmed that he understood his company to be a distributor for Quigley and Insulag and Panelag to be "Quigley refractory products."

[48] Rublee asserts that the trial court impermissibly weighed evidence in considering the summary judgment motion. But the trial court did not decide what a reasonable purchaser would understand. Rather, it necessarily determined that a reasonable person could not find from the evidence presented that a reasonable purchaser would think Pfizer manufactured the products. As long as a trial court faithfully applies the CR 56 standard, this is an appropriate question to answer.

First, Rublee's claim would fail under an "actual reliance" test. This test asks whether the plaintiff showed "that he or she actually and reasonably relied upon the reputed 'apparent manufacturer's' trademark, reputation, or assurances of product quality, in purchasing the defective product at issue."[49] A court can again apply this test from either of two viewpoints: the actual user's or the actual purchaser's.[50]

While Pfizer asks this court to require actual reliance, few courts have done so. The Stein court cited just one case where the court did this, a 1962 opinion from the Fourth Circuit.[51] And the Stein court held that the plaintiffs had not satisfied the test from either perspective, as they had not shown evidence that the decedent was even aware of the product, let alone relied on Pfizer's apparent manufacture of it.[52] The court also found that the record showed that the purchaser, Bethlehem Steel, had purchased the products from Quigley for

---

[49] Stein, 137 A.3d at 297.
[50] Stein, 137 A.3d at 297.
[51] See Stein, 137 A.3d at 297; Carney v. Sears, Roebuck & Co., 309 F.2d 300, 304 (4th Cir. 1962) ("[T]he basic test is whether or not the vendee reasonably believed in and relied upon the vendor's apparent manufacture of the product."). Pfizer cites several other cases; these do not articulate an actual reliance test but simply list lack of reliance evidence as a factor in granting or affirming summary judgment. See Yoder v. Honeywell, Inc., 900 F. Supp. 240, 245 (D. Colo. 1995), aff'd, 104 F.3d 1215 (10th Cir. 1997); Bernier v. One World Techs., Inc., 746 F. Supp. 2d 240, 243 (D. Mass. 2010); Stones v. Sears, Roebuck & Co., 251 Neb. 560, 558 N.W.2d 540, 545 (1997); Sherman v. Sunsong Am., Inc., 485 F. Supp. 2d 1070, 1080 (D. Neb. 2007).
[52] Stein, 137 A.3d at 297.

-16-

years before Pfizer acquired Quigley and continued to do so after, apparently without relying on Pfizer's role.[53]

Here, Rublee presented evidence that former workers noticed Pfizer's name on bags of Insulag and Panelag. At least one worker suggested that the Pfizer name made him think the products were safe. But no worker testimony shows that a worker relied on Pfizer's name in deciding to use or work near the products. Nor did Rublee present evidence that actual purchasers relied on Pfizer's apparent role when they purchased the products. Instead, as in Stein, the record shows that the industrial purchasers bought the products from Quigley without interruption before and after the Pfizer acquisition.

The evidence thus fails to create an issue of fact about either the purchasers' or the product users' actual reliance.

Second, Rublee's claim would fail under an "enterprise theory" of liability.

The enterprise liability test does not focus on consumer reliance but instead asks "whether the defendant 'participate[d] substantially in the design, manufacture, or distribution' of the defective product."[54] It also requires that the defendant's trademark appear on the product.[55]

---

[53] Stein, 137 A.3d at 299.

[54] Stein, 137 A.3d at 297 & n.25 (alteration in original) (quoting RESTATEMENT (THIRD) OF TORTS: PRODUCT LIABILITY § 14 cmt. d (AM. LAW INST. 1998)). The Stein court noted that while reliance is a rationale for this test, it does not appear to be a requirement. According to Restatement (Third), "Trademark licensors are liable for harm caused by defective products distributed

Only a few courts have applied this test.[56] In <u>Lou v. Otis Elevator Co.</u>,[57] the court held that a trademark licensor was liable as an apparent manufacturer because the plaintiff had shown that it "participated substantially in the design or manufacture of" a defective escalator. An escalator "prominently bore the Otis trademark" and "no other trade name or mark."[58] The court distinguished cases where plaintiffs failed to submit evidence, apart from the placement of the trademark on the product, that the defendant "'was engaged in the actual manufacture, distribution, or marketing.'"[59] Similarly, in <u>Connelly v. Uniroyal, Inc.</u>,[60] the court held that issues of fact precluded summary judgment on a claim that the defendant was liable as an apparent manufacturer for injuries caused by a tire bearing its trademark. The defendant provided the tire's actual manufacturer—a licensee and subsidiary—with plans, specifications, and technical knowledge for the tire's production, authorized the manufacturer's use of its trademark, and received quarterly payments in return.[61]

---

under the licensor's trademark or logo when they participate substantially in the design, manufacture, or distribution of the licensee's products. In these circumstances they are treated as sellers of the products bearing their trademarks." RESTATEMENT (THIRD) § 14, cmt. d.

[55] <u>Stein</u>, 137 A.3d at 297.
[56] See <u>Stein</u>, 137 A.3d at 297-98.
[57] 77 Mass. App. Ct. 571, 933 N.E.2d 140, 150 (2010).
[58] <u>Lou</u>, 933 N.E.2d at 143.
[59] <u>Lou</u>, 933 N.E.2d at 149-50.
[60] 75 Ill. 2d 393, 389 N.E.2d 155, 163, 27 Ill. Dec. 343 (1979).
[61] <u>Connelly</u>, 389 N.E.2d at 161. The same court later distinguished this decision, observing in <u>Hebel</u> that it based liability in <u>Connelly</u> on "the defendant's

The Stein court noted that Pfizer and Quigley did not have a trademark licensing agreement.[62] It concluded that even if the companies' arrangement was analogous to such an agreement, the plaintiff had presented no evidence that Pfizer "participated 'substantially' in the design, manufacture, or distribution of Insulag."[63]

Although Rublee does not explicitly assert this theory of liability, she contends that she presented evidence that Pfizer participated substantially in bringing Insulag and Panelag to market. We disagree.

Rublee's evidence of Pfizer's active involvement includes corporate annual reports referring to the Ireland construction site, purchase orders on Pfizer forms for the raw asbestos used to make the products, budget sheets that include research for different refractory methods, the invoices bearing the Pfizer logo, a Quigley sales manager's testimony that he was paid by Pfizer and known as a Pfizer employee, Pfizer's accounting for the products' costs and sales, evidence that Quigley and Pfizer shared insurance and that Pfizer provided safety guidance to Quigley, and a Quigley officer's statement, in response to a

---

integral involvement in the overall producing and marketing enterprise that placed the dangerous product in the stream of commerce, and its participation in the profits from the distribution of the product," and that such factors were absent in the case before it. Hebel, 442 N.E. 2d at 204.

[62] Stein, 137 A.3d at 298.

[63] Stein, 137 A.3d at 298.

question about "the leasing of [refractory] guns," that "[e]verything is handled in New York."

But Rublee does not dispute that Quigley made and sold Insulag and Panelag for decades before Pfizer acquired the company. She does not contend that Pfizer made any changes to the products' design. The references to a "Pfizer construction site" and Quigley being a "division of Pfizer" do not support an inference that Pfizer was involved in manufacturing. Nor does Pfizer's logo on Quigley invoices help show that Pfizer itself distributed the products. And while the asbestos order forms bear the Pfizer logo, a Quigley employee signed all of them. As in Stein, this evidence does not create an issue of fact as to whether Pfizer "'participate[d] substantially in the design, manufacture, or distribution'" of Quigley's products.[64]

Finally, Rublee's theory of liability based on comment d to § 400 also fails. Comment d indicates that a company can be liable as an apparent manufacturer if it "affixes to [the product its] trade name or trademark."[65] The comment explains that when a label identifies the company "as an indication of the quality or wholesomeness of the chattel, there is an added emphasis that the user can rely upon the reputation of the [company]."[66] But the comment also specifies that

---

[64] Stein, 137 A.3d at 298 (quoting RESTATEMENT (THIRD) § 14 cmt. d).
[65] RESTATEMENT (SECOND) § 400 cmt. d.
[66] RESTATEMENT (SECOND) § 400 cmt. d.

a trademark "licensor, who does not sell or otherwise distribute products, is not liable under this Section of this Restatement."[67]

Rublee contends that Pfizer vouched for the asbestos products' safety by allowing Quigley to use its well-known logo as an assurance of quality. While no evidence indicates the companies had a trademark licensing agreement, this court could view this situation as analogous.[68] Still, Pfizer did not "sell" or "distribute" the products as a more recent version of the Restatement requires for trademark license liability.[69] Moreover, the record shows that Quigley was clearly identified to purchasers as the manufacturer of Insulag and Panelag. Pfizer and Quigley employees testified that Quigley continued to manufacture the products and sell them using the same sales personnel. Quigley's sales force continued to correspond on Quigley letterhead, signing as Quigley. Invoices came from Quigley. Purchase orders went to Quigley. And numerous materials, including product labels, marketing materials, federal Occupational Safety & Health Administration (OSHA) data sheets, and a report to purchasers, identified Quigley to purchasers as the products' manufacturer. When those materials mentioned Pfizer, it was either as a parent company or in a small logo in the corner. And, as noted above, the record shows that actual purchasers like Lone

---

[67] RESTATEMENT (THIRD) § 14 cmt. d.
[68] See Stein, 137 A.3d at 298.
[69] RESTATEMENT (THIRD) § 14 cmt. d.

Star knew Quigley was still the manufacturer. Comment d thus does not provide a basis for liability.

A company that, like Pfizer, placed its logo on a product but did not sell it or "'participate substantially in [its] design, manufacture, or distribution'" should not expect to be held liable for harms the product caused.[70] On this record, any liability Pfizer incurred would stem not from representing itself as the dangerous products' manufacturer but from owning the company that did manufacture and sell the products.

Because Rublee's evidence does not create a genuine issue of material fact as to any theory of apparent manufacturer liability, the trial court did not err by granting summary judgment.

Pfizer separately contends that a defendant cannot be liable as an apparent manufacturer unless it was part of the "chain of distribution" that brought the harmful product to the plaintiff. But because Rublee's evidence does not satisfy any of the theories of apparent manufacturer liability, we do not decide whether the Washington Supreme Court would impose a chain of distribution requirement.

---

[70] Stein, 137 A.3d at 297 (quoting RESTATEMENT (THIRD) § 14 cmt. d).

## CONCLUSION

Because Rublee does not present evidence sufficient to create an issue of fact about any of the tests courts apply for apparent manufacturer liability, we affirm.

_Leach, J._

WE CONCUR:

_Cox, J._

_Becker, J._