

FILE
IN CLERK'S OFFICE
SUPREME COURT, STATE OF WASHINGTON
DATE NOV 0 1 2018
Fairhurst, CJ
CHIEF JUSTICE

This opinion was filed for record

at 8:00 am on Nov 1, 2018

SUSAN L. CARLSON
SUPREME COURT CLERK

# IN THE SUPREME COURT OF THE STATE OF WASHINGTON

|  |  |
|---|---|
| MARGARET RUBLEE, individually and as personal representative of the Estate of VERNON D. RUBLEE, <br><br>        Petitioner, <br><br>   v. <br><br> CARRIER CORPORATION; AIR & LIQUID SYSTEMS CORPORATION, as successor by merger to BUFFALO PUMPS, INC.; CBS CORPORATION, a Delaware corporation, f/k/a VIACOM, INC., successor by merger to CBS CORPORATION, a Pennsylvania corporation, f/k/a WESTINGHOUSE ELECTRIC CORPORATION; ELLIOTT COMPANY; GENERAL ELECTRIC COMPANY; IMO INDUSTRIES, INC., individually and as successor in interest to DE LAVAL TURBINE, INC.; INGERSOLL RAND COMPANY; LONE STAR INDUSTRIES, INC., individually and as successor in interest to PIONEER SAND & GRAVEL COMPANY; METROPOLITAN LIFE INSURANCE COMPANY; SABERHAGEN HOLDINGS, INC.; UNION CARBIDE CORPORATION; and WARREN PUMPS, LLC, individually and as successor in interest to QUIMBY PUMP COMPANY, <br><br>        Defendants, <br><br> PFIZER, INC., <br><br>        Respondent. | NO. 94732-5 <br><br><br> EN BANC <br><br><br><br> Filed   NOV 0 1 2018 |

STEPHENS, J.—This case presents a question of first impression: whether Washington should adopt the so-called "apparent manufacturer" doctrine for common law product liability claims predating the 1981 product liability and tort reform act (WPLA), ch. 7.72 RCW. As set forth in the *Restatement (Second) of Torts* § 400 (Am. Law Inst. 1965), this doctrine provides that "[o]ne who puts out as his own product a chattel manufactured by another is subject to the same liability as though he were its manufacturer." Today, we join the clear majority of states that have formally adopted the apparent manufacturer doctrine. Applying the doctrine to the facts of this case, we hold that genuine issues of material fact exist as to whether a reasonable consumer could believe that Pfizer was a manufacturer of the asbestos products that caused Vernon Rublee's illness and death. We reverse the Court of Appeals.

## FACTS AND PROCEDURAL HISTORY

Margaret Rublee is the surviving spouse of Vernon Rublee and the personal representative of Vernon's estate.[1] Vernon died of mesothelioma in 2015. Vernon was exposed to asbestos products while working as a machinist at Puget Sound Naval Shipyard (PSNS) between 1966 and 1980. As a machinist, Vernon worked on steam turbines that were insulated with asbestos "lagging." Clerk's Papers (CP)

---

[1] We use Vernon Rublee's first name for clarity, intending no disrespect.

at 866. PSNS workers periodically "de-lagged" the turbines, removing the existing insulation and replacing it with new insulation cement. *Id.* The de-lagging process involved pouring bags of insulation cement (commonly called refractories) into buckets or troughs, mixing in water, and stirring the insulation cement mixture with a trowel or hoe. This process created dust that lingered around the workplace, both when the cement was poured from the bag and when it was mixed, exposing PSNS workers to asbestos. *Id.* at 867.

In the 1960s and early 1970s, PSNS workers used two insulation cement products on the steam turbines—Insulag and Panelag. Vernon, as well as other PSNS workers, observed the name "Pfizer" printed on the product bags. *Id.* at 869-70. In fact, Quigley—not Pfizer—actually manufactured, sold, and distributed the products. Founded in 1916, Quigley made and sold refractory products for use in steel plants, power plants, and refineries. Quigley trademarked Insulag in 1936 and Panelag in 1945. *Id.* at 87, 89. Insulag and Panelag contained asbestos until 1974, when Quigley discontinued the sale of both products and replaced them with asbestos-free alternatives. *Id.* at 97.

Pfizer was founded in 1849 as a manufacturer of pharmaceutical products. Over the next century, Pfizer expanded its product line to chemicals, as well as agricultural and industrial products. In 1968, seeking to "establish[] a position in

refractory specialties," Pfizer acquired all of Quigley's capital shares and Quigley became a wholly owned subsidiary of Pfizer. *Id.* at 950.

According to Pfizer, following the acquisition, Quigley continued to do business as it had always done (until the asbestos products were discontinued in 1974). Resp't Pfizer Inc.'s Suppl. Br. at 4. Quigley operated the facility where Insulag and Panelag were manufactured and purchased the raw materials for both products from distributors. Quigley continued to handle sales and distribution of Insulag and Panelag by maintaining its own sales employees and receiving and filling customer orders. And, Quigley sales employees communicated with purchasers and distributors on Quigley stationery and signed letters on behalf of Quigley.

There was, however, one undeniable change following Pfizer's acquisition of Quigley. Following the acquisition, marketing and packaging materials for Insulag and Panelag were reconfigured to include reference to Pfizer. For example, on advertising fliers and other promotional materials, the Pfizer and Quigley logos appeared side by side, with the plural "Manufacturers of Refractories" printed below. CP at 952, 1028. Quigley sales employees distributed pocket calendars to customers that included both the Pfizer and Quigley logos. *Id.* at 965-66. Quigley's stationery stated that Quigley was a "Subsidiary of PFIZER, INC." and included a

Pfizer logo in the upper left corner. *Id.* at 963. Pfizer's logo also appeared in the top left corner of Quigley's invoices for Insulag and Panelag, and the technical data sheets for both products were changed to include the Pfizer logo above "Quigley Company Inc.," "A Subsidiary of PFIZER INC." *Id.* at 977, 975, 1686; *see also id.* at 975 (small print on technical data sheets, requiring "WRITTEN PERMISSION FROM PFIZER INC." to reproduce materials). Notably, as Vernon and fellow workers at PSNS observed, the bag labels on Insulag and Panelag referenced Pfizer. Post-1968, the bags identified Quigley as the manufacturer and Pfizer as the parent company. *Id.* at 567, 1821, 1824.

After the hazardous effects of asbestos became widely known, more than 160,000 plaintiffs filed asbestos-related suits against Quigley. Many of these suits also named Pfizer as a defendant. Quigley filed for Chapter 11 bankruptcy in 2004. In 2013, the United States District Court for the Southern District of New York approved Quigley's reorganization plan creating an asbestos injury trust under section 524(g) of the bankruptcy code to compensate asbestos claimants. *Id.* at 185. To protect the trust and ensure the equitable distribution of relief, the district court issued a "channeling injunction." *Id.* at 49-51. The channeling injunction requires asbestos claimants to seek relief solely from the trust and enjoins claimants from suing Quigley for asbestos-related injuries. The injunction also bars asbestos-related

claims against Pfizer, if based on Pfizer's prior ownership, management, or control of Quigley, including claims based on piercing the corporate veil or successor liability. The channeling injunction does not, however, bar claimants from alleging that Pfizer is liable as an "apparent manufacturer" under *Restatement (Second)* § 400. *Id.* at 50-51; *see In re Quigley Co.*, 676 F.3d 45, 59-62 (2d Cir. 2012) (holding the Quigley channeling injunction is inapplicable to § 400 claims because apparent manufacturer liability hinges on the presence of Pfizer's name and logo on Quigley products, not Pfizer's ownership interest or control of Quigley).

In September 2014, Vernon filed a personal injury action in King County Superior Court against Pfizer and several other companies for damages relating to asbestos exposure throughout his employment at PSNS.[2] CP at 1-4. As permitted by the channeling injunction, the suit sought to impose liability on Pfizer as an apparent manufacturer under § 400 of the *Restatement (Second)*, asserting that Pfizer represented itself as a manufacturer of the Insulag and Panelag products that caused Vernon's mesothelioma. After limited discovery, Pfizer moved for summary judgment on the ground that Rublee could not establish apparent manufacturer liability. *Id.* at 660.

---

[2] Margaret Rublee converted this case to a wrongful death action following Vernon's death on March 14, 2015.

The trial court held that § 400 applies to pre-WPLA product liability claims in Washington. *Id.* at 2923. Nonetheless, it granted Pfizer's motion, concluding that "a reasonable purchaser would not have been induced to believe that [Pfizer] was such apparent manufacturer of the injurious products, within the meaning of [*Restatement (Second)* § 400]." *Id.* at 2924. Recognizing that the scope and interpretation of § 400 presented questions of first impression in Washington, the trial court issued an order certifying the case for discretionary review pursuant to RAP 2.3(b)(4).

On appeal, a three-judge panel of the Court of Appeals affirmed the trial court, holding that Rublee's evidence did not create a genuine issue of material fact about Pfizer's status as an apparent manufacturer. *Rublee v. Carrier Corp.*, 199 Wn. App. 364, 383, 398 P.3d 1247 (2017). The panel initially considered whether § 400 applies in Washington and decided to "assume that the Washington Supreme Court would apply § 400 when presented with the appropriate case." *Id.* at 370-71. Applying § 400, the Court of Appeals held that Rublee failed to present evidence sufficient to create an issue of material fact under any of the three tests courts apply for apparent manufacturer liability—objective reliance, actual reliance, and enterprise liability. *Id.* at 371. With respect to the objective reliance test, the court held that apparent manufacturer liability should be viewed from the perspective of a

*sophisticated* user or commercial purchaser of the asbestos products, not from the viewpoint of an ordinary consumer or end user, such as Vernon or other PSNS workers. *Id.* at 372. Concluding that Rublee's evidence fell short of satisfying any theory of apparent manufacturer liability, the Court of Appeals declined to decide "which of these tests, if any, our Supreme Court would adopt." *Id.* at 371.

Rublee petitioned this court for review, which we granted. *Rublee v. Carrier Corp.*, 189 Wn.2d 1023, 406 P.3d 284 (2017).

## ANALYSIS

Summary judgment is appropriate only if there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law. *Macias v. Saberhagen Holdings, Inc.*, 175 Wn.2d 402, 408, 282 P.3d 1069 (2012); CR 56(c). We review a trial court's grant of summary judgment de novo, engaging in the same inquiry as the trial court. *Macias*, 175 Wn.2d at 407. We consider all facts submitted and all reasonable inferences from the facts in the light most favorable to the nonmoving party. *Wilson v. Steinbach*, 98 Wn.2d 434, 437, 656 P.2d 1030 (1982).

At the center of this case is the so-called "apparent manufacturer" doctrine, derived from § 400 of the *Restatement (Second)*. The doctrine developed in the early 20th century, many years before the adoption of strict product liability. *Rublee*, 199 Wn. App. at 370. In its broadest formulation, the apparent manufacturer doctrine

imposes a manufacturer's liability on a nonmanufacturing entity that holds itself out to the public as the actual manufacturer of a product. Given the doctrine's scant history in our state's product liability jurisprudence, we begin with a brief overview of its development.

Section 400 of the *Restatement (Second)*, entitled "Selling as Own Product Chattel Made by Another," provides:

> One who puts out as his own product a chattel manufactured by another is subject to the same liability as though he were its manufacturer.

The official comments to § 400 clarify the scope and applicability of this rule. It applies only where a nonmanufacturing entity "'puts out a chattel'" by supplying "it to others for their own use or for the use of third persons, either by sale or lease or by gift or loan." RESTATEMENT (SECOND) § 400 cmt. a. Comment d to § 400 describes the two predominant ways a nonmanufacturing entity puts out a chattel as its own product: (1) the entity appears to be the manufacturer of the product or (2) the product appears to have been made for the particular entity. In the first situation, the nonmanufacturer "frequently causes the chattel to be used in reliance upon his care in making it"; in the second, the entity causes the product to be used in reliance "upon a belief that he has required it to be made properly for him and that the actor's reputation is an assurance to the user of the quality of the product."

As a historical matter, courts first applied the apparent manufacturer doctrine to retailers and distributors who placed their own house labels on goods that had been manufactured by someone else.[3] In the early 20th century, nonmanufacturing sellers were not generally subject to liability for the defective products they sold unless they altered the goods postmanufacture, breached an express warranty, or otherwise caused the plaintiff's injury. *Stein v. Pfizer Inc.*, 228 Md. App. 72, 89, 137 A.3d 279 (2016). Against this backdrop, the apparent manufacturer doctrine emerged as a means to impose a manufacturer's liability on certain nonmanufacturing sellers who held themselves out to the public as a product's manufacturer but were otherwise subject to more lenient liability rules than the actual manufacturer. *Hebel v. Sherman Equip.*, 92 Ill. 2d 368, 371, 442 N.E.2d 199, 65 Ill. Dec. 888 (1982).

The apparent manufacturer doctrine is primarily a "species of estoppel": a nonmanufacturing seller who, through its labeling or advertising of a product, causes the public to believe it is the manufacturer of the product and to purchase the product in reliance on that specific belief is estopped from later denying its identity as the

---

[3] For a summary of the history of the apparent manufacturer doctrine, see *Stein v. Pfizer Inc.*, 228 Md. App. 72, 85-98, 137 A.3d 279 (2016). The apparent manufacturer doctrine first appeared in the 1934 publication of the *Restatement of Torts: Negligence*, as § 400, under the title "Vendor Selling as His Own Product Chattel Made by Another." RESTATEMENT OF TORTS: NEGLIGENCE § 400 (AM. LAW INST. 1934).

manufacturer for purposes of liability. *Id.* Under its estoppel-based rationale, the apparent manufacturer doctrine focuses on whether the nonmanufacturing seller induced consumers to believe that the seller actually manufactured the goods in question and to purchase those goods in reliance on that specific belief. RESTATEMENT OF TORTS: NEGLIGENCE § 400 cmt. d (AM. LAW INST. 1934).[4]

The first question in this case is whether Washington should recognize apparent manufacturer liability and adopt *Restatement (Second)* § 400. Both the majority and the dissent answer this question in the affirmative.

I. The Apparent Manufacturer Doctrine, as Set Forth in § 400 of the *Restatement (Second)*, Applies in Washington

Prior to *Rublee*, no Washington appellate court had discussed the apparent manufacturer doctrine in any detail. Only a single decision, dating to 1975, briefly acknowledged § 400 but stopped short of adopting it. *See Martin v. Schoonover*, 13 Wn. App. 48, 54, 533 P.2d 438 (1975) (stating, "[i]f a retailer adopts a product as his own, he is subject to the same liability for negligence as is the manufacturer").

---

[4] Comment d to § 400 of the *Restatement* explains:
The rule stated in this Section applies only where the chattel is so put out as to lead those who use it to believe that it is the product of him who puts it out. The fact that the chattel is sold under the name of the person selling it may be sufficient to induce such a belief, but this is not always so, as where the goods are marked as made for the seller, without stating the name of the maker, or where the seller is known to carry on only a retail business.

Despite the absence of precedent, the Court of Appeals decided to assume, "[f]or purposes of this appeal," that this court "would apply § 400 when presented with the appropriate case." *Rublee*, 199 Wn. App. at 371. Notably, Pfizer and Rublee agree that § 400 should apply to common law product liability claims in Washington, and neither party presently disputes the Court of Appeals' assumption that it does. We take this opportunity to formally adopt § 400 and recognize the apparent manufacturer doctrine for claims arising before the WPLA's effective date.

Adoption of § 400 builds on our general acceptance of *Restatement* principles in similar contexts, including our adoption of *Restatement (Second)* §§ 402A and 388. *See Ulmer v. Ford Motor Co.*, 75 Wn.2d 522, 531-32, 452 P.2d 729 (1969) (adopting § 402A); *Seattle-First Nat'l Bank v. Tabert*, 86 Wn.2d 145, 148-49, 542 P.2d 774 (1975) (applying § 402A to sellers and suppliers); *Fleming v. Stoddard Wendle Motor Co.*, 70 Wn.2d 465, 467-68, 423 P.2d 926 (1967) (adopting § 388). It is also in accord with the clear majority of jurisdictions to consider § 400 and to formally adopt it. *See Rublee*, 199 Wn. App. at 371; *see also Long v. U.S. Brass Corp.*, 333 F. Supp. 2d 999, 1003 (D. Colo. 2004) (collecting cases). Federal courts applying Washington law have twice previously concluded that we would adopt § 400 when presented with the opportunity. *Turner v. Lockheed Shipbuilding Co.*, No. C13-1747 TSZ, 2013 WL 7144096, at *2 (W.D. Wash. Dec. 13, 2013) (court order);

*Sprague v. Pfizer, Inc.,* No. 14-5084 RJB, 2015 WL 144330, at *3 (W.D. Wash. Jan. 12, 2015) (court order). It should therefore come as no surprise that we conclude § 400 appropriately applies to pre-WPLA cases in this state.

Recognizing § 400 for common law claims also aligns with Washington statutory law. In 1981, the Washington Legislature explicitly adopted apparent manufacturer liability in the WPLA by defining "manufacturer" to include "a product seller or entity not otherwise a manufacturer that holds itself out as a manufacturer." RCW 7.72.010(2). In enacting this provision, the legislature reasoned that when an entity "adopts the product as its own, [it] has, in a sense, waived [its] right to immunity and should be subject[ed] to a manufacturer's liability." 1 SENATE JOURNAL, 47th Leg., Reg. Sess., at 625 (Wash. 1981). Without question, the common law apparent manufacturer doctrine reverberates throughout this statement, now incorporated into our statute.

In contrast, the few states that have rejected the apparent manufacturer doctrine have found that their product liability statutes are incompatible with such liability. *See Goesel v. Boley Int'l (H.K.) Ltd.,* 664 F. Supp. 2d 923, 925 (N.D. Ill. 2009) (refusing to apply the apparent manufacturer doctrine because "the Illinois Supreme Court would find that the statutory provisions of the [Product Liability Act] have trumped the earlier judge-made doctrine and have defined the sole predicate

for the potential imposition of strict liability on a nonmanufacturer"); *Seasword v. Hilti, Inc.*, 449 Mich. 542, 537 N.W.2d 221, 224 (1995) (refusing to apply the apparent manufacturer doctrine because "Michigan's existing theories of seller liability and related tort doctrines . . . preclude the need for an apparent-manufacturer doctrine").

Here, we are not faced with any such conflict between common law apparent manufacturer liability under § 400 and the WPLA. The apparent manufacturer doctrine articulated in § 400 is entirely compatible with our state's statutory product liability law. Based on the WPLA's definition of "manufacturer," the act recognizes a cause of action for injuries arising after 1981 against a nonmanufacturing seller whose marketing and other business materials create the appearance that the seller is a manufacturer of a defective product. Claimants such as Vernon, whose injuries occurred prior to the WPLA's adoption, should also have the opportunity to hold nonmanufacturing sellers accountable for injuries caused by allegedly defective products. Formally adopting § 400 for claims arising before 1981 appropriately harmonizes common law product liability and negligence rules with the WPLA.

Having established that § 400 applies in Washington, we must decide what test to apply to determine if a nonmanufacturing entity is an "apparent manufacturer." The Court of Appeals examined three tests for apparent

manufacturer liability—objective reliance, actual reliance, and enterprise liability—and held that Rublee's apparent manufacturer claim against Pfizer would fail under any of these tests. *Rublee*, 199 Wn. App. at 371. Significantly, in applying the objective reliance test, the Court of Appeals held that "the objective reliance test depends on the perception of a reasonable purchaser in the actual purchaser's position," meaning "what a reasonable purchaser in the position of PSNS purchasers would have understood." *Id.* at 376. Rublee argues the Court of Appeals erred in analyzing objective reliance as from the perspective of the "sophisticated industrial entity" who actually purchased the product, rather than the ordinary, reasonable consumer who used it. *Id.* at 372; Pet. for Review of Margaret Rublee at 7. We agree. Courts should apply the objective reliance test and assess apparent manufacturer liability by considering all of the defendant's relevant representations in the advertising, distribution, and sale of the product from the perspective of an ordinary, reasonable consumer.

II.     Under the Objective Reliance Test, Apparent Manufacturer Liability Should Be Viewed from the Perspective of Ordinary, Reasonable Consumers

The apparent manufacturer doctrine revolves around the central question of when nonmanufacturers should be treated as manufacturers for the purpose of liability. The majority of courts following § 400 apply the objective reliance test.

*Rublee*, 199 Wn. App. at 371. The objective reliance test asks whether an *ordinary, reasonable consumer* could infer from the defendant's representations on labels, advertisements, or other relevant materials that the defendant manufactured the harmful product at issue. *Id.* at 371-72.

We join the majority of courts and adopt the objective reliance test for apparent manufacturer liability. Given its "reasonable consumer" focus, the objective reliance test is consistent with our general approach in product liability cases of looking at the reasonable expectations of ordinary users and consumers, not the particular plaintiff.[5] In fact, both the majority and dissent agree with the adoption of the objective reliance test to determine apparent manufacturer liability. *See* dissent at 1. In this instance, the dissent simply disagrees with the manner in which the test is applied. *Id.* Apparent manufacturer liability turns on whether an

---

[5] For this reason, we reject the actual reliance test, which requires proof that the purchaser or user "'actually and reasonably relied upon the reputed "apparent manufacturer's" trademark, reputation, or assurances of product quality, in purchasing the defective product at issue.'" *Rublee*, 199 Wn. App. at 377 (quoting *Stein*, 228 Md. App. at 102). Under this test, a plaintiff cannot establish apparent manufacturer liability absent proof of direct reliance on the nonmanufacturer's representations. In cases like Rublee's, where a commercial entity purchases nonconsumer products, plaintiffs will be hard pressed to prove *the entity's* actual reliance. Nor would requiring such proof be consistent with our consumer-focused product liability law. Amici rightly complain that this test drifts too far from Washington's "reasonable consumer expectations" focus. *See* Br. of Amicus Curiae Wash. State Labor Council AFL-CIO at 5; Br. of Amicus Curiae Wash. State Ass'n for Justice Found. at 12-14; Amicus Br. of Am. Ass'n for Justice at 16-17. We reject such a narrow approach to apparent manufacturer liability.

objectively reasonable consumer looking at Pfizer's representations vis-à-vis Insulag and Panelag could conclude that Pfizer was a manufacturer of the asbestos products. While the dissent would hold that an "objectively reasonable consumer" is best defined as the industrial purchaser in this unique application of apparent manufacturer liability, consideration of the ordinary, reasonable consumer's perspective keeps with existing Washington law.

The Court of Appeals below was quick to point out that Rublee's case varies from the classic apparent manufacturer scenario involving ordinary consumer goods.[6] In Rublee's case, Insulag and Panelag are nonconsumer products that were purchased by a commercial entity, Rublee's employer, but ultimately used by its employees. The situation is further complicated by the fact that Pfizer, the alleged apparent manufacturer, is the corporate parent of the actual manufacturer, Quigley. Based on these facts, the focus in this case is on determining how the objective

---

[6] A classic case is *Swift & Co. v. Blackwell*, 84 F.2d 130 (4th Cir. 1936). There, the plaintiff swallowed broken glass contained in a sealed can of evaporated or condensed milk bearing the Swift & Co. label. Swift argued it was not responsible for the injury because it did not manufacturer the product and had no direct contact or privity with the plaintiff. *Id.* at 132. The evidence established that the milk product was manufactured by another company for Swift, then sold by Swift to a retailer, who in turn sold the product to the plaintiff. *Id.* Relying on § 400 of the *Restatement*, the court concluded that Swift held itself out as the manufacturer by labeling the can as a Swift & Co. product and was therefore subject to manufacturer liability for the defective condition of the product it had sold to the retailer. *Id.*

reliance test applies in situations "[w]here the purchaser and consumer are not one and the same." Suppl. Br. of Pet'r at 2. Specifically, "whose perceptions are determinative to trigger liability under § 400"—the industrial purchaser or the end user of the product? *Id.*

The Court of Appeals agreed with Pfizer that the test should be applied from the viewpoint of a *reasonable commercial purchaser* of Insulag and Panelag, i.e., the agents who actually purchased the products for PSNS. *Rublee*, 199 Wn. App. at 372. Observing that "in cases where a sophisticated industrial entity purchased the product, courts have applied the test from the viewpoint of a 'reasonable purchaser' *in that position*," *id.* (emphasis added), the court held that the objective reliance test should be applied from the perspective of a "reasonable industrial purchaser" of the nonconsumer asbestos products. *Id.* at 375.

To support its sophisticated purchaser approach to objective reliance, the Court of Appeals relied primarily on the reasoning in *Stein*, 228 Md. App. at 98-102, a Maryland Court of Special Appeals' decision involving a similar apparent manufacturer claim against Pfizer. As in Rublee's case, the issue in *Stein* was whether Pfizer could be deemed an apparent manufacturer of Insulag, which was manufactured and sold to the plaintiff's employer by Quigley, both before and after Quigley became a wholly owned subsidiary of Pfizer. *Id.* at 75.

In deciding which viewpoint to apply in assessing objective reliance, the court in *Stein* initially concluded that "'whether a holding out has occurred must be judged from the viewpoint of the purchasing public, and **in light of circumstances as of the time of purchase**.'" *Id.* at 101 (quoting *Hebel*, 92 Ill. 2d at 375). Having determined that the circumstances surrounding the purchase were relevant to analyzing objective reliance, the *Stein* court resolved that the proper viewpoint from which to judge reliance depends on the type of product and purchaser at issue. According to the court, "in an 'apparent manufacturer' case involving a consumer product," the reliance issue is "merely a question of whether an ordinary, reasonable consumer purchaser would have relied upon a reputed 'apparent manufacturer's' reputation and assurances of quality in deciding whether to purchase the product at issue." *Id.* at 102 n.24. In contrast, where "the product at issue was not a consumer product" and "was purchased by a sophisticated user," *id.*, reliance must be judged "from the perspective of a reasonable purchaser, in the position of the actual purchaser." *Id.* at 99.

Applying this reasoning, the court in *Stein* required the plaintiff to show that "a reasonable purchaser of refractory materials, that is, [the defendant] Bethlehem Steel, during the time period from 1968 to 1974, would have relied upon Pfizer's reputation and assurances of quality in purchasing the refractory material at issue."

*Id.* at 101. Because "Bethlehem Steel was unquestionably a sophisticated purchaser of Insulag and . . . Insulag was not a consumer product," the court held that no reasonable fact finder could conclude that "a reasonable person, in the position of a Bethlehem Steel purchasing manager . . . , who had purchased Insulag for decades from Quigley, could have purchased Insulag in reliance upon Pfizer's reputation and assurances of quality." *Id.* at 102. As the court elaborated, there could be no reliance when it was "manifest that Bethlehem Steel knew, at all relevant times, that it was purchasing Insulag from Quigley, not Pfizer." *Id.*

In rejecting Rublee's apparent manufacturer claim, the Court of Appeals indiscriminately adopted the reasoning of *Stein*, holding that "the objective reliance test depends on the perception of a reasonable purchaser in the actual purchaser's position." *Rublee*, 199 Wn. App. at 376. Focusing on the perspective of a reasonable industrial purchaser in the position of PSNS, the Court of Appeals concluded that "[n]one of the evidence relevant to the understanding of industrial purchasers suggests they would think Pfizer manufactured the [refractory] products." *Id.*

We reject this "sophisticated purchaser" approach to apparent manufacturer liability as inconsistent with Washington law. We have long recognized that consumer protection is the touchstone of Washington's product liability law. *Zamora v. Mobil Oil Corp.*, 104 Wn.2d 199, 206, 704 P.2d 584 (1985) (describing

-20-

the "primary policy justification" for extending strict liability to remote sellers as the provision of "'maximum of protection'" to consumers). For that reason, the focus of our product liability jurisprudence has always been on the ordinary product consumer. More generally, we do not differentiate between types of users or consumers for purposes of liability. For example, Washington courts have uniformly rejected a sophisticated user defense, under which product distributors are not required to instruct or warn sophisticated users about certain risks because such users are presumably already aware of the risks due to their expertise or sophistication.[7]

---

[7] This approach is consistent with comment *l* to *Restatement (Second)* § 402A, which describes a product liability claimant broadly, stating:

> *User or consumer.* In order for the rule stated in this Section to apply, it is not necessary that the ultimate user or consumer have acquired the product directly from the seller, although the rule applies equally if he does so. He may have acquired it through one or more intermediate dealers. It is not even necessary that the consumer have purchased the product at all. He may be a member of the family of the final purchaser, or his employee, or a guest at his table, or a mere donee from the purchaser. The liability stated is one in tort, and does not require any contractual relation, or privity of contract, between the plaintiff and the defendant.
>
> "Consumers" include not only those who in fact consume the product, but also those who prepare it for consumption; and the housewife who contracts tularemia while cooking rabbits for her husband is included within the rule stated in this Section, as is also the husband who is opening a bottle of beer for his wife to drink. Consumption includes all ultimate uses for which the product is intended, and the customer in a beauty shop to whose hair a permanent wave solution is applied by the shop is a consumer. "User" includes those who are passively enjoying the benefit of the product, as in the case of passengers in automobiles or airplanes, as well as those who are

The only scenario in which we differentiate between types of users or consumers is in the pharmaceutical or medical device context, where the "learned intermediary" doctrine applies. Under the learned intermediary doctrine, a manufacturer of certain medical products, obtainable solely through the services of a physician, fulfills its duty to warn when it gives adequate warning to the physician who must prescribe the product. *Terhune v. A.H. Robins Co.*, 90 Wn.2d 9, 17, 577 P.2d 975 (1978). We adopted this doctrine primarily for public policy reasons focused on preserving the physician-patient relationship, and it is considered sui generis. We have expressly declined to adopt the learned intermediary doctrine in other contexts, particularly where workers are injured using products purchased by their employer. *See Ruiz-Guzman v. Amvac Chem. Corp.*, 141 Wn.2d 493, 508-11, 7 P.3d 795 (2000) (declining to adopt the learned intermediary doctrine in the pesticide context, where the farm business entity purchased the pesticides, but farm workers applied it).

Pfizer's sophisticated purchaser/informed user approach to apparent manufacturer liability is inconsistent with our consumer-focused product liability law. First, by considering only "evidence relevant to the understanding of industrial

---

utilizing it for the purpose of doing work upon it, as in the case of an employee of the ultimate buyer who is making repairs upon the automobile which he has purchased.

purchasers," this approach broadly imports a type of sophisticated user defense into Washington law. *Rublee*, 199 Wn. App. at 376. As noted, a product user's expertise or sophistication is generally irrelevant to a product distributor's liability. Second, by drawing a line between an "ordinary user" and "industrial purchasers" of asbestos products, this approach inches toward expanding the learned intermediary doctrine without a public policy necessity. *Terhune*, 90 Wn.2d at 16-17. For these reasons, we reject the "sophisticated purchaser" approach and any notion that objective reliance turns on the nature of the particular product (consumer versus nonconsumer) or the identity of the particular purchaser (informed user versus ordinary end user).[8]

---

[8] The analysis in *Brandimarti v. Caterpillar Tractor Co.*, 364 Pa. Super. 26, 527 A.2d 134 (1987), provides a useful example of how the reasonable consumer approach to objective reliance properly applies to cases involving nonconsumer products in commercial settings. In *Brandimarti*, the plaintiff was injured when the forklift he was operating overturned. *Id.* at 28. The record indicated that the forklift was purchased by the plaintiff's employer and manufactured by Towmotor Inc., a wholly owned subsidiary of the defendant, Caterpillar Tractor Company. *Id.* at 35. Although the forklift was manufactured by Towmotor, "[t]he Caterpillar trade name was, however, conspicuously displayed on the forklift." *Id.* (emphasis omitted). The *Brandimarti* court held that "[u]nder such circumstances Caterpillar could expect others to purchase the product in reliance on the skill and reputation associated with the Caterpillar name." *Id.* at 36. Rather than focusing on the fact that the forklift was a nonconsumer product purchased by a commercial entity, the court based its holding on the rationale underlying the apparent manufacturer doctrine: "The Restatement (Second) of Torts § 400 was drafted in recognition of the fact that where one's name appears on a product 'the actor's reputation is an assurance to the user of the quality of the product.'" *Id.* (quoting RESTATEMENT (SECOND) § 400 cmt. d). As noted, under the *Restatement* product "users" include both purchasers and end users who did not directly purchase the product. RESTATEMENT (SECOND) § 402A cmt. *l*.

While we reject Pfizer's sophisticated user approach, we also reject Rublee's call to ignore entirely Pfizer's representations made to commercial purchasers. For example, if we accepted as true Rublee's argument that the focus of § 400 "is on the perceptions of the end user," we would presumably look only to Pfizer's representations on Insulag and Panelag product packaging, or other similar materials available to the casual observer or end user, in determining whether Pfizer held itself out as the product manufacturer. Pet. for Review of Margaret Rublee at 11. We would ignore the fact that Pfizer's logo appeared on invoices for Insulag and Panelag, as well as on pieces of sales correspondence between Quigley salespeople and their commercial customers. Properly applying § 400, however, this evidence is potentially relevant to the ultimate issue of fact in this case—whether Pfizer held itself out as manufacturer of Insulag and Panelag.

We therefore believe it is appropriate to assess apparent manufacturer liability by considering all evidence relevant to reasonable consumers of the product at issue, consistent with Washington's "ordinary consumer expectation" approach. Under a consumer-focused objective reliance test, the plaintiff is required to show that an ordinary, reasonable consumer could have (1) inferred from the defendant's representations in the advertising, distribution, and sale of the product that the defendant manufactured the product and (2) relied on the defendant's reputation as

an assurance of the product's quality. The nature of the product or purchaser does not change the analysis. Unlike Pfizer's sophisticated purchaser/informed user approach, analyzing objective reliance from the perspective of the ordinary, reasonable consumer is consistent with the logical underpinnings of the apparent manufacturer doctrine and with our consumer-focused product liability law. Moreover, the reasonable consumer approach furthers the apparent manufacturer doctrine's estoppel-based rationale by focusing on all of the defendant's representations, whether on labels, advertisements, and other relevant materials.

Applying the objective reliance test to the facts in this case, resolution of Rublee's apparent manufacturer claim against Pfizer presents a close question that a trier of fact could decide either way. On the one hand, there is sufficient evidence in the record to support a finding of apparent manufacturer liability. The record shows that the labeling of Panelag and Insulag changed after Pfizer acquired Quigley, so that the logo listed both companies as "*Manufacturers* of Refractories— Insulations." CP at 952, 1028 (emphasis added). The product labels had formerly indicated that Quigley was the (singular) manufacturer. *Id.* at 923. On advertising fliers and other promotional materials, the Pfizer and Quigley logos appeared side by side, with the plural "*Manufacturers* of Refractories" printed below. *Id.* at 952, 1028 (emphasis added). Also relevant is evidence that the technical data sheets for

Insulag and Panelag included the Pfizer logo, listed Pfizer's address and telephone number, and instructed readers not to copy any of the information contained on the sheets "WITHOUT WRITTEN PERMISSION FROM PFIZER, INC." *Id.* at 975, 1686.

On the other hand, as the dissent observes, there is evidence in the record from which a trier of fact could find no apparent manufacturer liability. For example, Pfizer offered testimony that the product labels on bags of Insulag and Panelag identified the corporate relationship between Pfizer and Quigley and showed Quigley as the manufacturer of both products.[9] *Id.* at 567, 1821, 1824. While

---

[9] We caution, however, that comment d to § 400 suggests that this type of labeling is not necessarily dispositive. RESTATEMENT (SECOND) § 400 cmt. d. According to comment d:

> The mere fact that the goods are marked with such additional words as "made for" the seller, or describe him as a distributor, particularly in the absence of a clear and distinctive designation of the real manufacturer or packer, is not sufficient to make inapplicable the rule stated in this Section. The casual reader of a label is likely to rely upon the featured name, trade name, or trademark, and overlook the qualification of the description of source. So too, the fact that the seller is known to carry on only a retail business does not prevent him from putting out as his own product a chattel which is marked in such a way as to indicate clearly it is put out as his product. However, where the real manufacturer or packer is clearly and accurately identified on the label or other markings on the goods, *and it is also clearly stated that another who is also named has nothing to do with the goods except to distribute or sell them*, the latter does not put out such goods as his own.

(Emphasis added.) Thus, even assuming Quigley was identified as the product manufacturer, Pfizer is not relieved of liability when its name also appears on the product unaccompanied by a statement clarifying that Pfizer had nothing to do with the goods except to distribute or sell them. *See Carter v. Joseph Bancroft & Sons*

Pfizer's logo appears in the top left corner of Quigley's invoices for Insulag and Panelag, Quigley's logo is arguably featured more prominently in the top center, with "A Subsidiary of PFIZER INC." noted underneath it. *Id.* at 977. The Quigley pocket calendar and stationery similarly include Pfizer's and Quigley's logos, while identifying Quigley as a "Subsidiary of PFIZER, INC." *Id.* at 965-66, 963.

Considering all of the relevant facts in context and allowing for competing inferences therefrom, Pfizer's status as an apparent manufacturer cannot be decided as a matter of law on summary judgment. There remains a genuine issue of material fact as to whether an ordinary, reasonable consumer of Insulag and Panelag could infer from all of Pfizer's representations that Pfizer manufactured the asbestos products that caused Vernon's illness and death.

III.  Apparent Manufacturer Liability Is Not Limited to Sellers and Others in the "Chain of Distribution"

One final matter merits discussion. As an alternative ground to uphold the order granting summary judgment, Pfizer contends that "the apparent manufacturer doctrine applies only to parties that sell or distribute the product in question." Resp't

---

*Co.*, 360 F. Supp. 1103, 1107 (E.D. Penn. 1973) (holding defendants liable as apparent manufacturers of a defective dress when the dress label identified the actual manufacturer and included the defendants' trademark but did not "clearly state that defendants had nothing to do with the goods except to distribute or sell them").

Pfizer Inc.'s Suppl. Br. at 18. Because "Pfizer neither sold nor distributed the Quigley products," Pfizer asserts that it cannot be liable as an "apparent manufacturer" under § 400. *Id.* Stated differently, Pfizer argues that an apparent manufacturer must be in the "chain of distribution." We reject this argument.

Starting with § 400's text and comments, we see no indication that an entity's participation in the chain of distribution is dispositive of apparent manufacturer liability. Section 400 applies to "[o]ne who puts out as his own product a chattel manufactured by another." RESTATEMENT (SECOND) § 400. The words "'one who puts out a chattel' include anyone who supplies it to others." *Id.* cmt. a. And as comment d to § 400 clarifies, "one puts out a chattel as his own product when he puts it out under his name or affixes to it his trade name or trademark." The language in § 400 suggests that a nonmanufacturing defendant that places its trade name on products manufactured by another may assume apparent manufacturer liability based on the nature of its representations, regardless of whether it was a link in the chain of distribution. This makes good sense. Like the product assembler, the entity that affixes its trademark to a product manufactured by another represents a level of quality to the consumer and ultimate user, derives an economic benefit from the sale of the product, and should share in the costs of injury resulting from the defective product.

While the dissent would require all apparent manufacturers to be within a product's direct chain of distribution, this is incompatible with the reasonable consumer focus of apparent manufacturer liability. Dissent at 13. The apparent manufacturer doctrine does not require contractual privity, or focus on sellers and purchasers, as Pfizer maintains. Resp't Pfizer Inc.'s Suppl. Br. at 20. Instead, in addition to cost sharing, the justification for apparent manufacturer liability is that the defendant derives a benefit from including its trade name on a product manufactured by another, representing to consumers that the product is of a certain origin or quality. This is precisely why the doctrine's focus is on the expectations of ordinary, reasonable consumers. We hold that whether Pfizer played a role in the chain of distribution of Insulag or Panelag is not dispositive of Pfizer's status as an "apparent manufacturer."

## CONCLUSION

We formally adopt § 400 of the *Restatement (Second)* and recognize apparent manufacturer liability for claims arising before the WPLA's effective date. In assessing apparent manufacturer liability, we apply the objective reliance test, viewing all of the defendant's relevant representations from the perspective of the ordinary, reasonable consumer. The Court of Appeals erred in holding that objective reliance must be judged solely from the perspective of a sophisticated industrial

purchaser of asbestos products. Because Rublee presented sufficient evidence to create a genuine issue of material fact as to whether reasonable consumers could conclude that Pfizer was an apparent manufacture of the asbestos products, we reverse the Court of Appeals and remand for further proceedings.

Stephens, J.

WE CONCUR:

Wiggins, J.

Owens, J.

Madsen, J.

No. 94732-5

YU, J. (dissenting) — I am concerned with our adoption of an archaic feature of product liability law in order to compensate the plaintiff for claims already allowed under modern product liability standards. I agree with the majority that, in the right case, we should adopt the "apparent manufacturer" doctrine from the *Restatement (Second) of Torts* § 400 (Am. Law Inst. 1965). I also agree that the "objective reliance" test is the correct test under Washington law. I disagree, however, with the way the majority has applied that test here.

While compensation for injuries caused by products is imperative, we should not expand the apparent manufacturer doctrine to circumvent the reality that the plaintiff's claims are subject to an asbestos injury bankruptcy trust. The apparent manufacturer doctrine is not intended to address when a parent company is liable for a subsidiary's actions. Thus, we should reject the majority's attempt to

shoehorn that issue into a doctrine where it simply does not fit in order to achieve a particular outcome.

The trial court's analysis of the plaintiff's claims from the perspective of a reasonable purchaser was correct. I would therefore affirm the Court of Appeals and hold that Pfizer Inc. cannot be held liable in Margaret Rublee's wrongful death action as a matter of law. As such, I would not reach Pfizer's alternative argument that it cannot be held liable because it was not in the "chain of distribution." However, I must address the majority's incorrect conclusion that no such requirement exists. I respectfully dissent.

## ANALYSIS

The majority is generally accurate in its recitation of the history and purpose of the apparent manufacturer doctrine. *See* majority at 8-11. However, the majority's application of the objective reliance test is entirely inconsistent with its history and purpose because it ignores the crucial factor of *reliance*. I would hold that where the ordinary consumer of a product is *not* the ordinary purchaser, the objective reliance test must consider the ordinary purchaser's perspective. The perspective of consumers who play no role in purchasing the product cannot create a genuine issue of material fact precluding summary judgment.

2

A.   The objective reliance test should be applied from the perspective of the ordinary purchaser

Prior to the adoption of strict products liability in the 1960s and 1970s, a person who was injured by an unsafe product was required to prove negligence by the manufacturer or the seller. *See generally Stein v. Pfizer Inc.*, 228 Md. App. 72, 87-88, 137 A.3d 279 (2016) (citing RESTATEMENT OF TORTS §§ 388, 394-95 (AM. LAW INST. 1934)) (detailing the history of the apparent manufacturer doctrine). Manufacturers had more duties than sellers, so there were more ways to prove negligence by a manufacturer than negligence by a seller. For example, a manufacturer had a duty to warn of potential danger from use of a product; a seller did not. *Id.* A manufacturer had a duty to exercise reasonable care in manufacturing a potentially dangerous product; a seller did not. *Id.*

The apparent manufacturer doctrine emerged in cases where a retail seller or distributor held itself out to the public as the manufacturer, and where an ordinary purchaser would have no way of knowing who had actually manufactured the product. *E.g., Carney v. Sears, Roebuck & Co.*, 309 F.2d 300, 304-05 (4th Cir. 1962) (Sears liable for defects in ladder manufactured by another where purchaser relied on Sears's advertising and trade name on ladder); *Burkhardt v. Armour & Co.*, 115 Conn. 249, 264-65, 161 A. 385 (1932) (distributor of canned ham liable where the label containing the Armour name and trademark, but not the name of

3

the actual manufacturer, would lead an ordinary person to infer that Armour guaranteed safety of can's contents); *Thornhill v. Carpenter-Morton Co.*, 220 Mass. 593, 596-97, 108 N.E. 474 (1915) (paint manufacturer and dealer held liable for damage caused by paint manufactured by another where it put its label on product and represented that it was the manufacturer).

As noted by the majority, the apparent manufacturer doctrine is a "species of estoppel." Majority at 10-11. The doctrine applies where the seller "has induced the *purchasing public* to believe that it is the actual manufacturer, and to act on this belief—that is, to *purchase the product in reliance* on the apparent manufacturer's reputation and skill in making it." *Hebel v. Sherman Equip.*, 92 Ill. 2d 368, 371, 375, 442 N.E.2d 199, 65 Ill. Dec. 888 (1982). It is not intended to impose strict liability on everyone in the chain of distribution; its purpose is to hold sellers accountable for the reliance they induce.

It follows that whether a seller's representations have caused a purchaser to rely on a belief that the seller is the manufacturer of a product "must be judged from the viewpoint of the purchasing public, and in the light of circumstances as of the time of purchase." *Id.* at 375. In the case of consumer goods, the purchasing public consists of ordinary consumers. *Kennedy v. Guess, Inc.*, 806 N.E.2d 776, 784 (Ind. 2004) (purchasing public of umbrellas). But in commercial settings, the purchasing public is often different from the ordinary consumer. *Hebel*, 92 Ill. 2d

4

at 375 (purchasing public of car washing equipment). In both cases, the objective

reliance test should be applied from the perspective of a reasonable purchaser in

the position of the actual purchaser.[1]

This does not mean that in cases where the consumer is not the purchaser,

the consumer can never recover. It just means that the inquiry is whether an

ordinary, reasonable purchaser might have relied on a mistaken belief that the

product's seller was also its manufacturer. If so, then the apparent manufacturer

may be liable for the consumer's injury. *Heinrich v. Master Craft Eng'g, Inc.*, 131

F. Supp. 3d 1137, 1160 (D. Colo. 2015); *Brandimarti v. Caterpillar Tractor Co.*,

364 Pa. Super. 26, 36, 527 A.2d 134 (1987).[2]

---

[1] The majority contends that applying the objective reliance test from the perspective of an ordinary purchaser "broadly imports a sophisticated user defense into Washington law," and "inches toward expanding the learned intermediary doctrine without a public policy necessity." Majority at 22-23. That is simply not the case. When a seller induces the public to purchase a product on the belief that it is the manufacturer of that product, it is held liable as if it had actually manufactured the product. The extent of that liability has nothing to do with the sophistication of either the user or the purchaser and does not take into account what a "learned intermediary" would know.

[2] I disagree with the majority's claim that *Brandimarti* "provides a useful example of how the reasonable consumer approach to objective reliance properly applies to cases involving nonconsumer products in commercial settings." Majority at 23 n.8. In fact, *Brandimarti* held that Caterpillar was subject to liability as an apparent manufacturer because by placing its name on a forklift, it "could expect others to *purchase* the product in reliance on the skill and reputation associated with the Caterpillar name." 364 Pa. Super. at 36 (emphasis added). The ultimate consumer was the one who was injured, but the court's explicit focus was on the perspective of the ordinary purchaser.

B.     The majority's reliance on "ordinary consumer expectation" is misplaced

Courts that have applied the objective reliance test in situations where the ordinary purchaser of a product is different from the ultimate consumer have uniformly done so from the perspective of an ordinary purchaser. *Heinrich*, 131 F. Supp. 3d at 1160; *Hebel*, 92 Ill. 2d at 377; *Stein*, 228 Md. App. at 101; *Brandimarti*, 364 Pa. Super. at 36. The majority contends that "Washington's 'ordinary consumer expectation' approach" to product liability law dictates a different result. Majority at 24. I disagree. The ordinary consumer expectation approach was adopted in a different context for a different purpose.

The ordinary consumer expectation approach is used to determine whether a product is not reasonably safe, resulting in strict liability for the seller, distributor, or manufacturer. RESTATEMENT (SECOND) OF TORTS § 402A. "This means that it must be unsafe to an extent beyond that which would be reasonably contemplated by the ordinary consumer." *Seattle-First Nat'l Bank v. Tabert*, 86 Wn.2d 145, 154, 542 P.2d 774 (1975). This approach "allows the trier of the fact to take into account the intrinsic nature of the product," including factors not necessarily known at the time of purchase, such as relative cost, gravity of potential harm, and feasibility of eliminating the risk. *Id.* Thus, the focus in such a claim is "'not upon the actions of the seller or manufacturer'" but on the nature of the product itself.

6

*Falk v. Keene Corp.*, 113 Wn.2d 645, 649, 782 P.2d 974 (1989) (quoting *Lenhardt v. Ford Motor Co.*, 102 Wn.2d 208, 212, 683 P.2d 1097 (1984)).

In contrast, the apparent manufacturer doctrine *does* focus on the actions of the seller. The doctrine does not deal with the question of whether liability exists for injuries caused by a particular product but solely with the question of whether a particular defendant can be treated as if they had manufactured the product. In this context, we do not ask what an ordinary person would expect based on the nature of the product, but whether an ordinary person would reasonably believe that the seller is the manufacturer and would reasonably rely on the seller's reputation when deciding whether to purchase the product.

C.    Summary judgment was proper

Properly applied, the objective reliance test focuses on what a reasonable purchaser in the position of the actual purchaser would rely on. To subject Pfizer to apparent manufacturer liability, Rublee would need to prove that a reasonable purchaser of refractory products in the same position as a purchasing agent for the Puget Sound Naval Shipyard (PSNS) between 1966 and 1974[3] would have believed that Pfizer actually manufactured Insulag and Panelag and relied on that belief in making its purchasing decisions.

---

[3] Mr. Rublee began working at PSNS in 1966, Clerk's Papers (CP) at 864. Quigley discontinued the sale of Insulag and Panelag in 1974. *Id.* at 97.

The record contains numerous examples of product information, promotional items, and correspondence available to the ordinary purchaser that contain both Pfizer and Quigley names and logos. The record also includes testimony from the late Mr. Rublee and a coworker stating that the Pfizer name appeared on bags of Insulag and Panelag used at their workplace. Taken individually and as a whole, the evidence does not create a genuine issue of material fact as to whether an ordinary purchaser of the products would believe that Pfizer was the manufacturer.

Rublee first points to examples of the logos that appeared on promotional materials after Pfizer's acquisition of Quigley. The Pfizer and Quigley logos appear side by side and are the same height. Underneath the combined logos are the words "Manufacturers of Refractories – Insulation," with no other indication of the relationship between the two companies. Clerk's Papers (CP) at 952, 1028.[4] These examples are taken out of context. They are part of a multipage product

---

[4] Rublee also points out that a pre-acquisition logo contains the tagline "Manufacturer [singular] of Refractory Specialties and Paint" under the Quigley Company name while the combined post-acquisition logo says "Manufacturers [plural] of Refractories – Insulations" under the combined Pfizer and Quigley Company logos. *Compare* CP at 923 *with* CP at 952. The record, however, also contains several examples of the pre-acquisition logo using the plural "Manufacturers." *E.g., id.* at 2455, 2461, 2463. Regardless, the change in wording does not have the significance Rublee assigns to it because an ordinary purchaser at the time in question would not necessarily have known how Quigley advertised in the past. *Rublee v. Carrier Corp.*, 199 Wn. App. 364, 374 n.41, 398 P.3d 1247 (2017).

bulletin promoting Insulag. The cover of that bulletin clearly states that Insulag is

"*A QUIGLEY PRODUCT*" and contains no reference to Pfizer. *Id.* at 2402-11.

Next, Rublee points to company letterhead "emblazoned with Pfizer's

familiar oval logo." Pet. for Review at 3; *see* CP at 963. Petitioner overstates the

prominence of the Pfizer logo. The Quigley Company logo appears centered at the

top of the letterhead with the company's address underneath. At the bottom center

of the letterhead are the words "A Subsidiary of PFIZER, INC." CP at 963. The

oval Pfizer logo appears separately at the top left of the page. Additionally, the

example provided is an announcement that Quigley was discontinuing the

manufacture of Insulag and Panelag and contains the Quigley Company name

above the signature.

The record also includes a pocket calendar that was distributed to potential

purchasers by Quigley salespeople. *Id.* at 175-83. The Quigley logo appears

prominently on the top of the cover with Quigley identified as a subsidiary of

Pfizer at the bottom. *Id.* at 175. The inside cover is titled "Quigley Diary for

1974" and contains both the Pfizer and Quigley logos and indicates that Quigley is

a subsidiary of Pfizer. *Id.* at 176. The third page is the most relevant. It lists

Insulag and Panelag under the heading "Products Manufactured By QUIGLEY

COMPANY, INC. A Subsidiary of Pfizer, Inc." *Id.* at 178.

Technical data sheets for both Insulag and Panelag also refer to both Quigley

and Pfizer. *Id.* at 975, 1686. The predominant feature of these sheets is the

stylized Quigley "Q" at the top. The Pfizer logo appears much smaller at the

bottom right and clearly states underneath that Quigley is a subsidiary of Pfizer. A

fine-print legal disclaimer appears on the lower left of the sheet that instructs

readers not to copy or distribute the information without written permission from

Pfizer.[5]

What the record does not contain is evidence of what appeared on the bags

of Insulag and Panelag that were actually used at the shipyard and that actually

caused Mr. Rublee's injuries.[6] There is, however, testimony from both Mr. Rublee

and a coworker that Pfizer's name appeared on the products. *Id.* at 870, 878. For

purposes of summary judgement, we assume this to be true. Even so, the record

does not indicate how an ordinary purchaser of the product would have interpreted

the packaging, or that they would have relied on it at all.

Any inquiry into the perspective of the reasonable purchaser must account

for what is known by ordinary purchasers of the product.[7] The documents

---

[5] The sheets do not contain a telephone number. *Contra* majority at 26.

[6] The record contains three examples of what the product packaging might have looked like, but there is not enough information to support an inference that they represent the actual product packaging at issue. CP at 567, 1821, 1824.

[7] The majority concedes that information known only to purchasers is relevant and rejects Rublee's argument that courts should look only at information available to the ultimate consumer. Majority at 23-24. However, it makes no sense to consider information that is not

consistently refer to Insulag and Panelag as Quigley products and identify Quigley

as a subsidiary of Pfizer. It would be clear to an ordinary purchaser that there was

a relationship between the two companies, but "[a] parent/subsidiary relationship

alone would not give rise to a conclusion that Pfizer manufactured the product."[8]

*Sprague v. Pfizer, Inc.*, No. 14-5084 RJB, 2015 WL 144330, at *5 (W.D. Wash.

Jan. 12, 2015) (court order) (quoting *Turner v. Lockheed Shipbuilding Co.*, No.

C13-1747 TSZ, 2013 WL 7144096, at *3 (W.D. Wash. Dec. 13, 2013) (court

order)). This precludes application of the apparent manufacturer doctrine, and the

trial court properly granted summary judgment to Pfizer.

D.    Section 400 applies only within the chain of distribution

The majority holds that there is no chain of distribution requirement in

Washington for apparent manufacturer liability. Majority at 28. In doing so, the

majority cites only to the *Restatement* and ignores persuasive holdings from other

courts. I disagree with the majority's holding on this issue.

The plain text of section 400 makes it clear that a defendant must sell or

distribute a product to be subject to liability under section 400. Section 400 is

---

available to the ultimate consumer if our inquiry is focused on the consumer's perspective. No reasonable person can detrimentally rely on information he or she does not have.

[8] Pfizer concedes that Rublee could have brought claims against Pfizer based on Pfizer's corporate relationship with Quigley under theories such as successor liability and piercing the corporate veil. Resp't Pfizer Inc.'s Suppl. Br. at 1. However, these claims would be channeled to the federal bankruptcy trust.

11

titled "*Selling* as Own Product Chattel Made by Another." RESTATEMENT (SECOND) OF TORTS § 400 (emphasis added). The rule states that "[o]ne who puts out as his own product a chattel manufactured by another is subject to the same liability as though he were its manufacturer." *Id.* Thus, for a party to be subject to the "same liability as though he were its manufacturer," it must both (1) put out the product and (2) do so as if the product were its own. *Id.* The comments explain that "[t]he words 'one who puts out a chattel' include anyone who supplies it to others for their own use or for the use of third persons, either by sale or lease or by gift or loan." *Id.* cmt. a.

Most courts that have adopted section 400 have applied it "only where a retailer or distributor has held itself out to the public as the manufacturer of the product." *Torres v. Goodyear Tire & Rubber Co.*, 867 F.2d 1234, 1236 (9th Cir. 1989) (collecting cases). And "[m]any courts have declined to extend [section] 400 beyond sellers and retailers of defective products." *Yoder v. Honeywell Inc.*, 104 F.3d 1215, 1223 (10th Cir. 1997) (collecting cases). The only relevant exception appears to be *Brandimarti*, where Caterpillar faced apparent manufacturer liability because even though it "did not manufacture the product at issue and was not a supplier of the product participating in the chain of distribution, it did permit its name to appear on the equipment." 364 Pa. Super. at 36.

Consistent with the clear weight of authority, I would hold that section 400 is limited to those in the chain of distribution of a product.

The record contains excerpts from Pfizer annual reports, purchase orders for asbestos, budget documents, and other evidence that Rublee says create an issue of fact as to whether Pfizer has inserted itself into the chain of distribution. Whether the evidence supports that assertion or whether it merely indicates a corporate parent-subsidiary relationship is an issue that should be addressed by the trial court in the first instance. However, it is not necessary to remand for further consideration of that issue in this case because the trial court correctly concluded that no reasonable, ordinary purchaser would believe Pfizer was the manufacturer of Insulag and Panelag.

## CONCLUSION

The objective reliance test asks whether a seller's representations would lead a reasonable person to believe that the seller, and not some other party, was the actual manufacturer, and to rely on that belief in deciding whether to purchase and use the product. This question can be answered only by considering the perspective of the purchaser because the purchaser is the one who makes the decision. Based on the record in this case, no reasonable ordinary purchaser would believe Pfizer was the manufacturer. I therefore respectfully dissent.

_____

Yu, J.

Gordon McCloud, J.

Fairhurst, CJ.

No. 94732-5

GONZÁLEZ, J. (concurring in dissent)—I concur with my colleagues that the common law apparent manufacturer doctrine governs pre-Product Liability Act claims. I also concur with my colleagues that the objective reliance test is the correct test. I concur with the dissent that when the ordinary purchaser of the product is not the ordinary consumer, we view objective reliance from the ordinary purchaser's perspective and that under that perspective, summary judgment was properly granted. As the dissent amply demonstrates, on the evidence presented, the ordinary purchaser of refractory products at the time would not have believed Pfizer Inc. was the manufacturer. Dissent at 7-11.

On these facts, we need not reach whether an apparent manufacturer is within the direct chain of distribution of the product. I would not.

With these observations, I respectfully concur in dissent.